United States District Court

For the Northern District of California

1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   IN RE WAUKEEN Q. MCCOY                    No. C 16-04079 WHA
                                              Br. No. 14-30381 HLB
11

12                                            **ORDER AFFIRMING DECISION
                                              OF BANKRUPTCY COURT RE
13                                            SPECIAL DEAL FOR DEBTOR
                                              WAUKEEN MCCOY**
14

15   _____/

16                              **INTRODUCTION**

17         This is an appeal from the bankruptcy court's orders (1) approving a sale of the estate's

18   interest in real property, and (2) granting in part and denying in part debtor's motion for

19   reconsideration.  The bankruptcy court's decision as to both orders is **AFFIRMED**.

20                               **STATEMENT**

21         In March 2014, debtor and appellant Waukeen McCoy filed for Chapter 13 bankruptcy.

22   At the time, he resided at and held in joint tenancy real property located on Clayton Street in

23   San Francisco.  In June 2014, McCoy successfully moved to convert his bankruptcy case to

24   Chapter 11.  In April 2015, the Trustee successfully moved to convert the case to Chapter 7.

25   **1.     TRUSTEE'S MOTION TO SELL.**

26         In March 2016 and after "nearly six month[s] of marketing efforts," the Trustee moved

27   to sell the subject property — with the co-owner's consent — to prospective purchasers for $2.2

28   million, free and clear of all liens and subject to overbid.  Any overbid had to be at least $2.225

**United States District Court**
For the Northern District of California

1   million.  The Trustee asked Bankruptcy Judge Hannah Blumenstiel to authorize use of the sale

2   proceeds to, among other things, pay a five percent commission, or $110,000, to be divided

3   equally between Mark Benson, the Trustee's broker, and Gavin Stuart, the prospective

4   purchasers' broker.  The Trustee also asked Judge Blumenstiel to require McCoy to vacate the

5   premises by the time the sale closed.

6          McCoy opposed the Trustee's motion to sell.  The Trustee's reply, however, revealed

7   that McCoy had actually participated in the overbid procedure, with some modifications.

8   Specifically, McCoy had overbid to purchase only the estate's 50 percent interest in the subject

9   property for $210,500, "an amount calculated to provide the estate with the equivalent cash

10  proceeds . . . that would have been generated if the Property was sold for the minimum overbid

11  price of $2.25M [*sic*]," and "*subject to* all liens and encumbrances (rather than free and clear of

12  all liens)" (Dkt. No. 3-35 at 2).  There had been no other overbids, and the prospective

13  purchasers declined to participate in an auction to bid against McCoy's overbid.  The Trustee

14  therefore intended to seek Judge Blumenstiel's approval to instead sell the estate's 50 percent

15  interest in the subject property to McCoy, as McCoy wished, with the prospective purchasers as

16  backup buyers in case McCoy failed to perform.[1]

17         Prior to the hearing on his overbid, McCoy had signed a draft purchase and sale

18  agreement that provided for a purchase price of "no less than $210,500" (Dkt. No. 3-35 at 33).

19  That agreement remained in draft form pending the anticipated auction on McCoy's overbid,

20  which might have raised the final purchase price (*see* Dkt. No. 3-50 at 21, 24).  As stated,

21  however, no auction took place because no one bid against McCoy's overbid.

22         The prospective purchasers objected to McCoy's overbid.  They protested that McCoy

23  had not satisfied the overbid requirements because he did not offer at least $2.225 million to

24  purchase the *entire* subject property free and clear of liens.  Moreover, they criticized the plan

25  to accept McCoy's overbid because it would not pay the creditors whose liens were tied up in

26

27  _____

    [1]  The Trustee's reply also noted that "[t]he $2.2M purchase price [was] an accurate reflection of the
28  fair market value of the Property as no other buyer [had] come forward to present an overbid," and "the
    Trustee's broker marketed the Property for over six months before [the prospective purchasers] presented their
    offer of $2.2M" (Dkt. No. 3-35 at 5–6).

United States District Court

For the Northern District of California

the subject property.  They further criticized McCoy's overbid on the basis that, while Benson (the Trustee's broker) would still be paid for his efforts no matter what, Stuart (the prospective purchasers' broker) would receive no compensation for his work if Judge Blumenstiel approved McCoy's overbid.  Finally, the prospective purchasers refused to act as backup buyers in case McCoy's overbid fell through.

At the hearing on the Trustee's motion to sell, Judge Blumenstiel asked McCoy if he was "prepared to proceed with the transaction on the terms that [were] recently proposed." McCoy confirmed that he was (Dkt. No. 3-42 at 3:3–4:6).  Judge Blumenstiel therefore indicated she would grant the Trustee's motion and approve "the overbid sale of the estate's interests to the debtor on the terms recently proposed by the trustee" (*id.* at 4:13–4:16).  McCoy assured Judge Blumenstiel that he would be able to hold up his end of the deal but added, "I don't think I should pay for the broker's fee because there's no sale" (*id.* at 5:17–5:20).  The Trustee (through her attorney) then confirmed her intent "to pay Mr. Benson, who is the trustee's broker, without whose efforts this overbid would never have taken place."  Judge Blumenstiel replied, "I have no problem with that either" (*id.* at 6:9–6:12).

A written order issued on April 25, 2016, overruling the prospective purchasers' objection and approving the Trustee's sale of the estate's 50 percent interest in the subject property to McCoy for $210,500, subject to all liens and encumbrances.  The order observed that McCoy's overbid was "the highest and best offer presented and resulted in more consideration to the estate than [the prospective purchasers'] offer" (Dkt. No. 3-38 at 2).  The order also authorized the Trustee to pay Benson $55,000 for his broker's commission.

**2.    MCCOY'S MOTION FOR RECONSIDERATION.**

McCoy paid the Trustee (*see* Dkt. No. 3-54 at 4:8–4:14) but also moved for reconsideration of the order approving the sale, claiming he had actually agreed to purchase the estate's 50 percent interest in the subject property for only $175,000.  He argued that Judge Blumenstiel had improperly conflated the purchase price with Benson's broker's commission of $55,000, which McCoy contended he should not have to pay because it would be exorbitant

3

given his accepted overbid.  Significantly, McCoy did not seek to undo the sale, but rather demanded that the Trustee return $55,000 of the purchase price to him.[2]

McCoy apparently pulled the figure of $175,000 from a letter he had written to the Trustee on April 2, 2016, wherein he offered that sum in exchange for the Trustee abandoning the subject property (Dkt. No. 3-49 at 12–14).  The Trustee had rejected that offer in a reply letter on April 6, 2016, stating (*id.* at 16 (footnote omitted)):

> The Trustee cannot seek to abandon the Clayton Property in light of the pending sale motion but is willing to allow you to participate in the overbid procedures outlined in the sale motion, with some modifications that would allow you to bid only on the estate's 50% interest in the property, subject to all liens.
>
> As you know, the minimum overbid for the property is $2.25 [*sic*] million.  A sale at that price would generate net proceeds to the estate in the approximate amount of $155,500 after payment of the brokers' commission due to the Trustee's real estate broker and the buyer's broker.  Without the Trustee's broker's efforts, we would not have been able to procure a buyer for the Clayton Property and for that reason, the amount of the overbid must also include the $55,000 sales commission that would otherwise be payable to the Trustee's broker.  Therefore, the amount of your minimum overbid to acquire the estate's 50% interest in the property, subject to all liens, is approximately $210,500.

On April 11, 2016, and as part of a series of email exchanges hashing out details of the modified overbid procedure, McCoy emailed the Trustee (Dkt. No. 3-50 at 13):

> Also, in your most recent correspondence you indicated that the broker's fee would be included in the purchase of my 50% interest even though no "sale" would occur if I am the highest bidder.  Can you explain why this condition has been added to my purchasing 50% when the house will not be sold free and clear of the liens?  Although Mr. Benson secured the buyers in contract, they may not end of [*sic*] purchasing the property.

The next day, the Trustee replied, "Mr. Benson will be paid a commission from the disposition of the property because the overbid process would not have been made possible without his efforts" (*id.* at 15).  McCoy did not further argue the point until the hearing on the Trustee's

---

[2]  The calculations in McCoy's motion are clearly erroneous.  At one point, for example, he claimed he bought the estate's 50 percent interest in the subject property for $175,000, Benson's commission was $55,000, and Judge Blumenstiel approved a purchase price of $210,000 (Dkt. No. 3-39 at 2).  Later on the same page, he correctly identified the purchase price as $210,500.  His theory seemed to be that Judge Blumenstiel erroneously added $55,000 to $175,000 to arrive at either $210,000 or $210,500 (*see id.* at 2–3; Dkt. No. 3-43 at 4), but $175,000 plus $55,000 actually equals $230,000.

United States District Court
For the Northern District of California

4

United States District Court

For the Northern District of California

1    motion to sell, when he commented, "I don't think I should pay for the broker's fee because

2    there's no sale" (Dkt. No. 3-42 at 5:17–5:20).  Nor did McCoy otherwise indicate that his

3    continued participation in the overbid procedure depended in any way on the Trustee ultimately

4    reducing or eliminating Benson's expected commission.

5         The Trustee opposed McCoy's motion for reconsideration, unequivocally stating she

6    had never agreed to sell the estate's 50 percent interest in the subject property to McCoy for less

7    than $210,500 (Dkt. No. 3-49 at 2).  The Trustee also pointed out the inconsistencies in

8    McCoy's own calculations of the purported true purchase price.

9         In his reply in support of his motion for reconsideration, McCoy shifted ground,

10   changing his version of the true purchase price from $175,000 to $155,500.  He claimed that

11   when the Trustee "wrote that it was her belief that the Estate would obtain a benefit in the

12   amount of $155,500 after payment of the brokers' commission," he "understood that [$155,500]

13   was the minimum bid amount" required to purchase the estate's 50 percent interest in the

14   subject property (Dkt. No. 3-50 at 2).

15        At the hearing on McCoy's motion for reconsideration, Judge Blumenstiel — referring

16   to the draft purchase and sale agreement McCoy had signed — reminded McCoy that he had

17   agreed to purchase the estate's 50 percent interest in the subject property for "no less than

18   $210,500" and asked him to explain how he could get around that agreement (Dkt. No. 3-53 at

19   7:11–7:25).  McCoy responded that the draft "was not the final agreement," and that he "had to

20   sign [the draft] in order to participate in the auction" (*id.* at 8:1–8:4).  He did not dispute,

21   however, that the draft purchase and sale agreement accurately represented the actual approved

22   terms of sale.  Judge Blumenstiel then asked, "where does this contract say that part of that

23   money is intended as a broker fee?"  McCoy admitted the contract contained no such provision

24   but claimed, again shifting ground, that he had paid the purchase price of $210,500 "under

25   protest as to the broker's fee" in order to save his house (*id.* at 9:3–10:11).

26        Judge Blumenstiel indicated that McCoy would have to "live with" the promise he

27   made, but that Benson would likewise have to live with his own commission contract to receive

28   only "five percent of the *selling price*."  Judge Blumenstiel also commented, "it's not like this

5

1    difference [in commission] would be going back to [McCoy].  It would be going to pay

2    creditors" (*id.* at 16:3–16:22).  She concluded (*id.* at 19:14–20:20):

> [The sale] contract clearly sets forth the purchase price as
> $210,500 and doesn't differentiate between the amount that was
> paid for the real property and an amount . . . earmarked for Mr.
> Benson.  So I find and conclude that the Debtor agreed to pay
> $210,500, and so I'm going to deny the motion to the extent it
> requests . . . a finding that what Mr. McCoy paid for the property
> was $155,000.  It's simply not supported by the evidentiary record.
>
> The calculation of the commission that the estate ultimately
> intended or may have already paid to Mr. Benson is another thing
> entirely.  The contract with Mr. Benson indicates that he agreed to
> accept a five percent commission . . . .  Mr. Benson was entitled to
> a five percent commission calculated on the selling price, which
> was $210,500.  By my calculation, that means he was entitled to a
> commission of $10,525 . . . .
>
> The difference remains in the estate because as I originally
> concluded, the price that Mr. McCoy agreed to pay for this
> property was $210,500.

13   A written order issued on July 8, 2016, granting in part the motion for reconsideration

14   on the basis that, because the purchase price ended up at $210,500, Benson's commission

15   should have been five percent of $210,500, or $10,525.  The order denied the motion for

16   reconsideration in all other respects.

## ANALYSIS

18   The gravamen of McCoy's position on appeal is that the bankruptcy court should have

19   ordered the Trustee to refund McCoy $44,475 — the difference between Benson's expected

20   commission of $55,000 and his approved commission of $10,525 — because McCoy

21   supposedly paid the purchase price of $210,500 "under protest" (*see* Dkt. Nos. 1-3 at 1–3, 3-55

22   at 1–4, 7 at 3).

23   As a preliminary matter, the Trustee urges dismissal of this appeal because McCoy, a

24   trial attorney, failed — twice — to timely file his opening brief.  McCoy's opening brief was

25   originally due on October 27, 2016.  On October 31, McCoy belatedly moved to continue that

26   deadline.  A prior order granted the motion and continued the due date for the opening brief to

27   November 14.  McCoy missed that deadline too and filed his opening brief on November 17.

28   McCoy's reply brief defends his untimeliness by citing California Rule of Court 8.220 for the

United States District Court

For the Northern District of California

1   proposition that, once he missed the deadline for his opening brief, the court clerk had to notify

2   him in writing that he had 15 days to file it (Dkt. No. 9 at 6–7).  This is a total non-starter

3   because California Rules of Court have nothing to do with federal practice.  As a trial attorney,

4   McCoy surely knows better.  The Court agrees that the appeal should be dismissed on this

5   ground but will reach the merits anyway.

6          The bankruptcy court's rulings on the Trustee's motion to sell the subject property and

7   McCoy's motion for reconsideration are both reviewed for abuse of discretion.  *In re Clark*, 266

8   B.R. 163, 168 (B.A.P. 9th Cir. 2001); *In re Hansen*, 368 B.R. 868, 875 (B.A.P. 9th Cir. 2007)

9   (citing *In re Weiner*, 161 F.3d 1216, 1217 (9th Cir. 1998)).  McCoy has utterly failed to show

10  the bankruptcy court abused its discretion.

11         *First*, McCoy cites case law for the proposition that bankruptcy courts can set aside

12  sales on equitable grounds, and argues that he "was in an unfair bargaining position because he

13  would not be able to participate in the bidding process unless he complied with the [Trustee's]

14  unfair demand" (Dkt. No. 7 at 6–7).  To reiterate, McCoy does *not* seek to set aside the sale.  He

15  has no intent to return his 50 percent interest in the subject property acquired through the sale

16  — he rather wants to keep it for a reduced price.

17         Neither McCoy nor the record provides any support for his repeated characterization of

18  Benson's commission — calculated based on the original $2.2 million deal with the prospective

19  purchasers derailed by McCoy's overbid — as "exorbitant."  McCoy's own requested relief on

20  appeal — not a complete excision of Benson's commission from the purchase price but a mere

21  refund for the difference between Benson's expected and approved commissions — belies any

22  suggestion that inclusion of the commission in the purchase price is somehow inappropriate.

23  Finally, McCoy's complaint that not being able to participate in bidding without paying the

24  asking price constitutes an "unfair bargaining position" is baffling.  McCoy seems to believe he

25  was somehow *entitled* to bid on the subject property on his own terms instead of the Trustee's

26  (*see id.* at 7 (claiming the Trustee took "unfair advantage" of McCoy by "refusing to allow

27  [him] to bid on his own property without inclusion of the excessive broker's fees")).  Yet

28  another non-starter.

**United States District Court**
For the Northern District of California

*Second*, and to support his contention that the sale was unfair, McCoy points out that "the Attorney for [the prospective purchasers] reasoned that the overbid procedures [for McCoy] did not comply with the [Trustee's] noticed procedures for the sale" (*ibid.*). Counsel for the prospective purchasers made that argument in the context of urging the bankruptcy court to reject McCoy's overbid because it *had not complied with the noticed overbid procedure*. McCoy cherry-picks and distorts the prospective purchasers' argument to suit his purposes but ignores the larger fact that, had they prevailed, the subject property would have sold to them instead of to him.

*Third*, McCoy claims that "[t]here was no contract for the purchase of the [subject] property," and that the written contract he signed "was for Bidding Purposes Only" (*id.* at 9). The bankruptcy court found to the contrary, and its findings of fact are reviewed for clear error. *In re Int'l Fibercom, Inc.*, 503 F.3d 933, 940 (9th Cir. 2007). No such error occurred here.

Once the prospective purchasers withdrew as the only other potential buyers, the Trustee clearly communicated to McCoy that the "draft" agreement he had signed would become final upon the bankruptcy court's approval. The record contains *no* evidence of any renegotiation thereof, much less evidence of any other "agreement" reached between McCoy and the Trustee. The Trustee flatly denies any other agreement existed. McCoy never memorialized any different "agreement." He must resort to bald assertion for his only support but, even now, cannot consistently describe the supposedly different "agreement." For example, he requests only a refund of the difference between Benson's expected and approved commissions, even though he claims the "real" sale agreement excluded the broker's commission altogether. And in his opening brief, he reverts to his original position that he should pay only $175,000 — an amount he himself had previously admitted to be erroneous. It would be redundant and wasteful to retrace the many inconsistencies in McCoy's calculations of what the purchase price was "supposed" to be. The bottom line is that his inability to produce a consistent story further belies his assertion that a different sale agreement existed.

In his reply brief, McCoy claims the bankruptcy court actually "modif[ied] the Purchase Agreement to reflect that the broker's fee of $55,000.000 was to be reduced to $10,525.00"

United States District Court
For the Northern District of California

(Dkt. No. 9 at 6).  This is false.  The bankruptcy court expressly found that McCoy had agreed to pay $210,500, and that the correct amount of commission under Benson's contract was "another thing entirely" (Dkt. No. 3-53 at 19:23–19:25).  And — in yet another perplexing arithmetic error — McCoy seems to forget that if a five percent commission for Benson amounted to $10,525, then the predicate purchase price *must have been $210,500.*  In short, McCoy's assertion that the bankruptcy court crafted a new agreement that superseded his agreement with the Trustee is contradicted by both the record and third-grade math.

Significantly, McCoy never made any serious effort to renegotiate his deal with the Trustee.  He never made his overbid contingent on any specific terms, including omission of broker's fees.  Rather — despite complaining about various decisions of the Trustee throughout the sale process and briefly griping on two occasions about Benson's commission — McCoy unambiguously agreed to pay the Trustee's price to retain his home.  That price included a cash payment of $210,500 with no delineation for Benson's commission, whether as-expected or subject to the bankruptcy court's approval.  The purchase price was the purchase price, McCoy agreed to pay it, and his agreement did not hinge on any condition — including the possibility that the bankruptcy court might disapprove of or reduce Benson's commission.  Only after affirming and re-affirming his agreement to the deal, obtaining the Trustee's consent and the bankruptcy court's approval, and acquiring the estate's 50 percent interest in the subject property did McCoy about-face to complain that he paid too much.  This order refuses to bless McCoy's Soviet-style negotiation — "what's mine is mine and what's yours is negotiable."

The Trustee and Judge Blumenstiel showed McCoy more leniency than most trustees or bankruptcy judges (or district judges) would have — far more.  Allowing McCoy to retain his home required both specially modifying the overbid procedure for him and passing up a chance to sell the subject property free and clear of liens to prospective purchasers prepared to pay $2.2 million for it.  Having reaped the benefits of his special deal and chased off the prospective purchasers, McCoy now wants to renegotiate the terms of that special deal.  The bottom line is that McCoy *agreed* to those terms and the time has come for him to honor his word.  Whether

or not he liked the conditions imposed by the Trustee, the bottom line is that he *accepted* those conditions.  Judge Blumenstiel was within her discretion in insisting that McCoy keep his word.

**CONCLUSION**

The bankruptcy court's decision is **AFFIRMED** as to both its order approving the Trustee's motion to sell the estate's interest in the subject property and its order denying in part McCoy's motion for reconsideration.  Judgment shall follow.

**IT IS SO ORDERED.**

Dated:  March 30, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

10